UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JEFFREY D. FRY,

                    Petitioner,                Case No. 4:05-cv-10

v.                                        Honorable Richard Alan Enslen

MARY BERGHUIS,

                    Respondent.
_____/

## <u>REPORT AND RECOMMENDATION</u>

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted by a jury in the Kalamazoo County Circuit Court of assault with intent to commit murder, MICH. COMP. LAWS § 750.83; third-degree fleeing and eluding a police officer, MICH. COMP. LAWS § 750.479a(3); possession of marijuana, MICH. COMP. LAWS § 333.7403(2)(d); and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b(a). On July 13, 1998, the trial court sentenced Petitioner to prison terms of twenty to thirty years, three to five years, two years and ninety days, respectively. In his *pro se* petition, Petitioner raises twelve grounds for relief, as follows:

    I.      THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR NEW TRIAL ON THE BASIS OF NEWLY DISCOVERED EVIDENCE BECAUSE THE DEFENDANT PRESENTED TESTIMONY THROUGH DARYLNZO BROWN THAT HE WAS THE ACTUAL PERPETRATOR OF THE CRIME RATHER THAN THE [SIC] MR. FRY THEREBY EXONERATING MR. FRY FROM ANY WRONGDOING AND THE TESTIMONY FURTHER ESTABLISHED THAT MR. FRY COULD NOT WITH REASONABLE DILIGENCE HAVE PRODUCED THIS EVIDENCE AT HIS TRIAL.

II.     THE DEFENDANT WAS DENIED A FAIR TRIAL WHEN THE PROSECUTOR IMPEACHED THE DEFENSE WITNESSES BY QUESTIONING THEM AS TO WHY THEY HAD NOT COME TO THE POLICE BEFORE TRIAL WITH THE INFORMATION THEY POSSESSED CONCERNING THE INCIDENT THEREBY DENYING THE DEFENDANT OF DUE PROCESS PURSUANT TO US CONST AMS V, XIV; AND MICHIGAN CONST 1963, ART I § 17.

III.    THE PROSECUTOR ENGAGED IN PROSECUTORIAL MISCONDUCT WHEN DURING CROSS EXAMINATION SHE ELICITED TESTIMONY FROM THE DEFENDANT THAT HIS DEFENSE WITNESSES HAD VISITED HIM WHILE IN JAIL, THEREBY DENYING THE RIGHT TO DUE PROCESS PURSUANT TO US CONST AMS V, XIV; AND MICHIGAN CONST 1963, ART I § 17.

IV.     THE PROSECUTOR ERRONEOUSLY CROSS[-]EXAMINE[D] THE DEFENDANT WHICH REVEALED THAT THE DEFENDANT MADE NO STATEMENT UPON ARREST THEREBY DENYING HIM DUE PROCESS PURSUANT TO US CONST AMS V, XIV; AND MICHIGAN CONST 1963, ART I § 17.

V.      DEFENDANT['S] STATE AND FEDERAL CONSTITUTIONAL RIGHTS [WERE] VIOLATED WHERE A SUGGESTIVE IDENTIFICATION WAS ALLOWED TO GO UNCORRECTED DURING HIS TRIAL PROCEEDINGS IN VIOLATION OF THE DEFENDANT'S DUE PROCESS OF LAW UNDER THE 14TH AMENDMENT AND WAS THE DEFENDANT'S RIGHT TO COUNSEL VIOLATED DURING A SUGGESTIVE PRETRIAL PHOTOGRAPHIC LINE-UP IN VIOLATION OF HIS 6TH AMENDMENT CONSTITUTIONAL RIGHT.

VI.     DEFENDANT WAS DENIED HIS 14TH AMENDMENT CONSTITUTIONAL AMENDMENT RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL WHEN THE TRIAL COURT FAILED TO CENSURE THE ADMITTANCE OF HIGHLY PREJUDICIAL PHOTOGRAPHS THAT WERE USED TO INFLAME THE PASSION OF THE JURY.

VII.    DEFENDANT WAS DENIED HIS 5TH AND 14TH CONSTITUTIONAL AMENDMENT RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL WHEN THE PROSECUTION MADE IMPERMISSIBLE CLOSING ARGUMENTS.

VIII.   DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL [WERE] VIOLATED WHERE FOR NUMEROUS REASONS (I.E. FAILURE TO OBJECT TO

PROSECUTORIAL MISCONDUCT TRIAL ERRORS AND/OR HIGHLY PREJUDICIAL EVIDENCE WAS COMMITTED DURING HIS TRIAL PROCEEDINGS).

IX.  IT IS UNCONSTITUTIONAL FOR THE TRIAL COURT TO FAIL TO ADDRESS THE DEFENDANT['S] MOTION FOR RELIEF FROM JUDGMENT BY RELYING ON MCR 6.508(D)(3) AS IT INFRINGES UPON THE LEGISLATIVE INTENT.

X.  DEFENDANT WAS DENIED DUE PROCESS AND EQUAL PROTECTION OF LAW [] UNDER THE 14TH AMENDMENT WHEN THE TRIAL COURT ABUSE[D] ITS DISCRETION AND IMPOSED A SENTENCE THAT WAS DISPROPORTIONATE.

XI.  THE CUMULATIVE EFFECT OF INEFFECTIVE ASSISTANCE OF COUNSEL, PROSECUTORIAL MISCONDUCT AND TRIAL COURT ERRORS VIOLATE[D] DEFENDANT['S] CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE 6TH AND 14[TH] AMENDMENT[S].

XII.  DEFENDANT-APPELLANT WAS DENIED DUE PROCESS OF LAW WHEN THE TRIAL COURT DENIED DEFENDANT-APPELLANT'S MOTION FOR A NEW TRIAL/EVIDENTIARY HEARING BASED ON NEWLY DISCOVERED EVIDENCE OF JUROR IMPARTIALITY AND MISCONDUCT.

Respondent filed an answer (docket #13) claiming that Petitioner's claims are without merit or are procedurally defaulted.  Petitioner filed a reply (docket #53).  For the reasons set forth below, I recommend that the Court deny Petitioner's application for habeas relief.

## Procedural History

### A.  Trial Court Proceedings

Petitioner was accused of shooting the victim, Jermaine Venson four times with a sawed-off shotgun in the City of Kalamazoo on January 26, 1998.  Because Venson survived the shooting, Petitioner was charged with assault with intent to commit murder.  He also was charged with possessing a firearm during the commission of a felony, third-degree fleeing and eluding a police officer and possession of marijuana.  Petitioner was tried before a jury on June 16-23, 1998.

- 3 -

Police officer Tracey Seifferly of the Kalamazoo Department of Public Safety testified that she was sitting in a parking lot writing a report at 12:30 a.m. on January 26, 1998, when she heard five or six shotgun blasts coming from the area behind her. (Tr. II, 48.)[1] Seifferly pulled out of the parking lot and headed northbound on Simpson Street in the direction of the shotgun blasts. (Tr. II, 51.) As she was driving, Seifferly noticed a blue car traveling west on Ada Street. The car made a left turn onto Simpson and passed Seifferly. She observed three black males in the car and recorded the license plate number. (Tr. II, 51.) Seifferly and the blue car were the only cars in the area. (Tr. II, 52.) Seifferly was advised of a shooting victim at 829 Woodbury and went to that address. (Tr. II, 53.) When Seifferly entered the residence, she found the victim laying face-down on the floor. (Tr. II, 55.) Seifferly could see that he was missing part of his right ear and was bleeding profusely. (Tr. II, 55.) The victim told her that he had been shot four times and believed that he was going to die. (Tr. II, 56.) At that point, Officers Vorick and Swanson arrived and assisted Seifferly in removing the victim's clothing to locate the gunshot wounds and administer first aid. (Tr. II, 57.) The victim had gunshot wounds to the head, stomach, back and left thigh. (Tr. II, 57.)

When Seifferly asked the victim who shot him, he responded, "the guys next door." (Tr. II, 60.) Seifferly was familiar with Petitioner, who lived two doors down, and asked the victim if he meant Jeff Fry. (Tr. II, 61.) The victim responded, "yeah." (Tr. II, 61.) The victim told Seifferly that before he was shot, he was talking to five or six black males in the lot between 817 and

---

[1] The trial transcripts will be referred to as follows:
"Tr. I" -  June 16, 1998 (docket #43)
"Tr. II" - June 17, 1998 (docket #44)
"Tr. III" - June 18, 1998 (docket #45)
"Tr. IV" - June 23, 1998 (docket #46)
"Tr. V" - June 24, 1998 (docket #47).

825 Woodbury.  (Tr. II, 61, 67.)  One of the men said something to the effect of, "Who the f---

cares," and pulled a sawed-off shotgun out from under his coat and started shooting at him.  (Tr. II,

61-62.)  The victim stated that he was shot once from the front and three more times from the back

as he tried to flee.  (Tr. II, 62.)  The victim fell to the ground and "played dead" until he was certain

that the shooter was gone.  (Tr. II, 62.)  The victim did not know the shooter's name and could not

describe him other than that he was a black male, but said that he could identify the shooter if he saw

him again.  (Tr. II, 62, 64, 77.)  The victim told police that there was a light-complected black male

standing next to him when he was shot.  The victim did not know the man's name, but believed that

Terrance Burton could identify the person standing next to him when he was shot.  (Tr. II, 65.)

Mable Brown testified that she had lived at 829 Woodbury for eighteen years.  (Tr.

II, 93.)  Mable testified that Petitioner's grandmother, Catherine Fry, lived next door to the south at

825 Woodbury and Petitioner's Aunt, Beverly Fry (Brown), lived at 819 Woodbury.  (Tr. II, 94-95.)

House number 819 is the next house south of house number 825, but they are separated by a vacant

lot.  (Tr. II, 104.)  Mable knew the victim because he was her granddaughter's fiancee.  (Tr. II, 95.)

The victim had been living with Mable Brown for about three months.  (Tr. II, 96.)  During that time,

Mable had seen Petitioner in the neighborhood.  (Tr. II, 96.)  The victim went out on the evening of

January 25, and told Mable that he would be home at around midnight.  (Tr. II, 96-97.)  Mable went

up to bed at 11:30 p.m. and left the door unlocked for the victim.  (Tr. II, 97-98.)  While Mable was

sitting in bed, she heard four gun shots - two large bangs and two small ones.  (Tr. II, 98.)  The sound

of gunshots was common in the neighborhood, so she did not get out of bed to investigate.  (Tr. II,

99.)  Shortly thereafter, Mable heard  the victim come into the house, a "boom" on the floor and the

victim saying that he was shot.  (Tr. II, 99.)  The victim told her that he had been shot four times.

- 5 -

When Mable asked who shot him, the victim responded, "Jeffrey." (Tr. II, 100-02, 106.) Mable

testified that she told the police officers that the victim stated to her that Jeffrey Fry had shot him.

(Tr. II, 107.)

Officer Michael Vorick testified that while he and the other officers were assisting

the victim, he asked the victim who shot him. (Tr. II, 83.) The victim answered, "the guy next

door." (Tr. II, 83.) The victim also stated that "they" ran into the house next door after the shooting.

(Tr. II, 83.) Officer Theodore Swanson testified that he heard the victim say that he was shot by the

people next door. (Tr. II, 89.) The victim told Swanson that he had been shot with a shotgun. (Tr.

II, 91.) Officer Scott Sanderson also responded to 829 Woodbury after the shooting. (Tr. IV, 5.)

While he was there, he talked to Mable Brown. (Tr. IV, 7.) With regard to the identity of the

shooter, Brown stated that the victim told her that "it was very dark outside, but [he] knew it was

them next door." (Tr. IV, 7, 10.)

Teresa Ann Brown, Petitioner's aunt, testified that she lived at 825 Woodbury. (Tr.

II, 110.) Teresa was engaged to Mable Brown's son. (Tr. II, 116.) She arrived home from work at

11:15 p.m. on January 25. (Tr. II, 112.) Teresa was in her bedroom when she heard the three or four

gunshots. She heard a car leave while shots were still being fired. (Tr. II, 110.) The other people

in the house that night were her mother, Catherine Fry; her baby, Makiyah; her sister, Thelma Fry;

Thelma's daughter, Destiny Brown; and her brother, Herbert Brown. (Tr. II, 115.) Teresa testified

that no one had come in or out of the house after she got home from work. (Tr. II, 114.) Teresa

allowed the police to search the house, but they did not find anything. (Tr. II, 114.) Petitioner,

Darlynzo Brown, Antonio Brown and Orlando Walker were Teresa's nephews. (Tr. II, 117-18.)

Teresa testified that at the time of the shooting, Petitioner was living with his mother on Nazareth

Road, Darlynzo and Antonio lived with their mother at 817 Woodbury, and Orlando lived at 825 Woodbury.  (Tr. II, 117-18.)

    The victim, Jermaine Venson, was twenty-four years old at the time of the trial.  (Tr. II, 130.)  Venson testified that, on the night of Janaury 25, he went to a friend's house to watch the Super Bowl.  (Tr. II, 130.)  Venson returned home to 829 Woodbury shortly after midnight.  (Tr. II, 131.)  After he arrived home, he stood  across the street and talked to three young men.  (Tr. II, 132.)  Venson only recognized one of the men, who was named Damion.  (Tr. II, 134.)  Venson was carrying a Koran and a history book of different religions, cultures and civilizations.  (Tr. II, 133.)  Venson talked to the men about Islam.  (Tr. II, 135.)  After a few minutes, two of the men walked away and Venson continued to talk with Damion.  (Tr. II, 137.)  Venson and Damion crossed the street and stood on the sidewalk in front of 829 Woodbury.  (Tr. II, 138, 141.)  Five or ten minutes later, Petitioner walked up to Damion and asked for a light.  (Tr. II, 139.)  Damion gave Petitioner a light for his cigarette and Petitioner turned around as if he was going to walk away.  (Tr. II, 140.)  Petitioner turned back around and Venson could see that he was holding a shotgun.  Petitioner asked Venson what he was doing out there.  Venson responded that he was talking about religion and Allah.  (Tr. II, 142.)  Petitioner told Venson, "No, [you're] not," and starting firing the shotgun at him.  (Tr. II, 142.)  Petitioner was approximately six to nine feet from Venson when he started firing.  (Tr. II, 143.)  After the first shot in the stomach, the victim dropped his books and started running toward the house.  (Tr. II, 145-46.)  He felt more shots in his back and in the back of his head.  (Tr. II, 146.)  He was shot four times.  Venson fell to the ground and pretended like he was dead so Petitioner would stop shooting.  (Tr. II, 146.)  After waiting five or ten minutes, Venson got up and ran into the house.  (Tr. II, 148.)

Venson had seen Petitioner at the house next door more than thirty times before the shooting, but did not know his name. (Tr. II, 148-49.) Venson had never had a conversation with Petitioner and had no idea why he would want to harm him. (Tr. II, 180-81.) When Venson told the police officers that the "guy next door" shot him, he was referring to Petitioner. (Tr. I, 150.) Venson identified Petitioner in a photographic lineup while he was recuperating in the hospital. (Tr. II, 183, 192.) Venson was absolutely certain that Petitioner was the person that shot him. (Tr. II, 149.)

Officer Todd Weston was on patrol in the area where the shooting occurred. (Tr. II, 199.) After he heard the shots, he received information from Officer Seifferly about the blue car that was in the area. (Tr. II, 200.) Weston passed a car matching the description and license plate number given by Siefrerly. Weston turned around and began to follow the car. (Tr. II, 206.) When Weston activated his lights and then his siren, the car began to pick-up speed. The car continued for about two blocks before the car stopped and the three occupants fled. (Tr. II, 207.) Weston pursued the men on foot. (Tr. II, 212-13.) Weston apprehended Troy Elliott and Officer Kirtley apprehended Petitioner within about three minutes after they left the car. (Tr. II, 183, 218, 236.) Officers Weston and Kurtley continued to search for the third man by following footprints in the snow. (Tr. II, 215.) The footprints led them past a dog kennel where they found a shotgun partially buried in the snow. (Tr. II, 215.) The third person ultimately apprehended by police was Darlynzo Brown. (Tr. II, 236.)

Officer Martin Buffenbarger worked with the canine unit. (Tr. II, 239.) Buffenbarger with his dog assisting apprehended the third suspect from the car. (Tr. II, 243.) He learned later that the suspect was named Brown. (Tr. II, 247.) Buffenbarger estimated that it took five minutes to apprehend the third suspect. (Tr. II, 246.) Officer David Toth also assisted in the apprehension of the third suspect, who was identified as Darlynzo Brown. (Tr. III, 40-42.)

Officers Kirtley and Brinkman testified that they joined Officer Weston in the pursuit of the blue Oldsmobile. (Tr. III, 12, 46-48.) The car continued down the road at a high rate of speed after the three police cruisers had activated their lights and sirens. (Tr. III, 13, 49.) The car finally came to a fast stop and three men fled from the car. (Tr. III, 13.) The officers apprehended two of the suspects within one to five minutes after they exited the car. (Tr. III, 16, 49.) Petitioner was one of those men. (Tr. III, 16, 48-49.) At the time of his arrest, Petitioner was wearing a dark blue pull-over style jacket with a hood. (Tr. III, 49.) Petitioner had a bag of marijuana in the front pocket of his jacket. (Tr. III, 50, 139.) According to Kirtley, Petitioner had been driving the car. (Tr. III, 17.) The third suspect was apprehended shortly thereafter. (Tr. III, 19.) Officer Kirtley followed the footprints of the third suspect through the snow, which led to a dog kennel. Kirtley observed a shot gun laying in the snow inside the kennel. (Tr. III, 19.) Kirtley also recovered a leather jacket hanging on a fence. (Tr. III, 22.) It appeared to Kirtley that the jacket got caught in the fence while someone was going over it. (Tr. III, 22.)

Lisa Johnson testified that at the time of the shooting, she lived with her Aunt, Mable Brown, at 829 Woodbury. (Tr. III, 31.) Johnson was sleeping on the living room couch when she heard Venson come through the door and fall on the floor. (Tr. III, 33.) Johnson called the police from the living room and then went upstairs while her aunt tended to Venson. (Tr. III, 35.) She stayed upstairs until Venson was taken away in the ambulance. (Tr. III, 35-36.) Johnson did not recall Venson making any statements about who shot him, nor did she recall making any statements to police officers that Petitioner had implicated "Jeff" or the "person next door." (Tr. III, 37.) Johnson never went to the hospital to see Venson. (Tr. III, 38.)

Tracy Cochran, a crime scene technician for the Kalamazoo County Department of Public Safety, testified that she collected the gun and a leather jacket from the area where the three men were arrested. (Tr. III, 62.) The gun was a .12-gauge sawed-off Mossberg pump shotgun. (Tr. III, 63.) Police Technicians were unable to lift any fingerprints from the shotgun. (Tr. III, 73-74.) A State of Michigan identification card belonging to Darlynzo Brown was found in the pocket of the leather jacket. (Tr. III, 75.) Cochran also collected evidence from the area of the shooting. She recovered four shotgun shell spent casings and some felt-type shotgun wadding in front of 829 Woodbury. (Tr. III, 103-09.) They also were unable to lift any finger prints from the spent casings. (Tr. III, 138.) James Bullock of the Michigan State Police crime lab, an expert in firearms, testified that the crime lab was asked to determine whether four fired shells and some wadding were fired from the shotgun recovered by police officers in this case. (Tr. III, 81-82.) He concluded that the four shells were fired from that shotgun. (Tr. III, 89.)

Damion Bates was seventeen years old at the time of trial. (Tr. III, 147.) Bates testified that he grew up with Petitioner and was his friend. (Tr. III, 148.) On January 25, Bates watched the Super Bowl with Petitioner and other people at Beverly Fry's house on Woodbury. (Tr. III, 155, 180.) Bates did not recall what Petitioner was wearing that day. (Tr. III, 176.) After the game, Bates went outside and talked with his friend B.J. (Tr. III, 156.) While they were talking, the victim came up to them and starting talking about the football game. (Tr. III, 157.) After fifteen or twenty minutes, B.J. left. (Tr. III, 160.) While Bates and Venson continued to talk, a man walked up and asked what they were talking about. (Tr. III, 162.) The man was wearing a black winter coat and a sweatshirt hood pulled tight over his head and face. (Tr. III, 162.) Bates said, "nothin' " and did not recall Venson saying anything. (Tr. III, 162, 167.) The man then pulled a .12 gauge shotgun

out of his coat and shot Venson.  (Tr. III, 162, 166.)  Bates took off running and heard a few more shots.  (Tr. III, 164.)  He did not see where the shooter went because he was trying to get away from him.  (Tr. III, 170.)  Bates testified that he could not identify the person because he did not see his face.  (Tr. III, 163-64.)  Bates did not recall any discussion with Venson about Islam before the shooting occurred.  (Tr. III, 159.)

Bates testified that the last time he saw Petitioner before the shooting, he was sitting in his car with Troy Elliot, Tawana Fullerton and Nakiva Spruill.  (Tr. III, 182-83.)  The car was a blue Oldsmobile 98.  (Tr. III, 187.)  When Bates came out of the house, he and B.J. started out talking by Petitioner's car.  (Tr. III, 183.)  Bates testified that when the shooter approached, he could still see four people around the car.  (Tr. III, 184-85.)  Bates did not see what happened to the car after the shots were fired.  (Tr. III, 187.)  Bates testified that when he fled the scene after the shooting, he ran into Fullerton and Spruill on Florence.  (Tr. III, 167-69, 171, 186.)  Bates testified that he did not recall what he told Detective Hatter during an interview the day of the shooting.  (Tr. III, 175, 177.)  Bates did not want to be involved in the incident, so he did not give Hatter a true account of what had occurred.  (Tr. III, 175-76.)  For example, Bates admitted to lying when told Hatter that he was not right next to the victim when he was shot.  (Tr. III, 174-75.)  Bates also admitted that he lied to Detective Hatter during an interview the day after the shooting when Bates stated that he and Venson were talking about Islam and that the man asked him for a cigarette before he shot Venson.  (Tr. III, 173-74.)

Detective Kenneth Alofs testified that he presented a photo lineup to the victim the day after the shooting.  (Tr. III, 193.)  The victim positively identified Petitioner as the shooter.  (Tr. III, 197.)  Alofs learned that the car that was chased by police and left abandoned on Staples Street

was registered to Petitioner's mother, Cheryl Minor, and her husband.  (Tr. III, 199.)  Alofs interviewed Petitioner for about ten minutes on the day of the shooting.  (Tr. III, 200.)  According to Alofs, Petitioner "ended up not wanting to answer any further questions after a very short time." (Tr. III, 200.)  Petitioner told Alofs that he ran from police because he, Darlynzo and Troy were smoking marijuana, although he denied knowing the other occupants of the car.  (Tr. III, 201-02.) He also stated that he was not the driver of the car.  (Tr. III, 202.)

Dr. Mark Tagett, a surgeon at Bronson Hospital, testified that he operated on the victim on January 26, 1998.  (Tr. IV, 16.)  Tagett testified that the victim was alert and cooperative when he arrived at the hospital.  (Tr. IV, 20.)  The victim had shotgun wounds to the chest, right flank and buttock area, the back of the right side of his head and ear and the right lower abdomen. (Tr. IV, 21-30.)  According to Tagett, the victim's injuries were life threatening (Tr. IV, 28.)

Troy Elliott testified that he was Petitioner's best friend and would do anything for him.  (Tr. IV, 35, 53.)  Elliott testified that Petitioner was living on Woodbury at the time of shooting, but also stayed with his mother sometimes.  (Tr. IV, 35-36.)  Elliott was with Petitioner watching the Super Bowl on Woodbury Street on January 25, 1998.  (Tr. IV, 37.)  Elliott testified that they were drinking alcohol and smoking marijuana.  (Tr. IV, 51-52.)  Elliott testified that he was sitting in Petitioner's car in the driveway of 817 Woodbury with Petitioner, Nikiva Spruill and Tawana Fullerton when he heard the shots.  (Tr. IV, 37-38, 49-50.)  The car was parked facing the road.  (Tr. IV, 49-50.)  Elliott did not know the victim, but recognized Damion Bates standing next to him.  (Tr. IV, 42.)  Elliott saw the shooter, but it was not Petitioner.  (Tr. IV, 38, 42-43.)  Elliott did not see Petitioner or anyone else with a gun in the car.  (Tr. IV, 39.)  After the shooting, the girls got out of the car and Darlynzo Brown came out of the house and got into the car with Petitioner and

- 12 -

Elliott.  (Tr. IV, 57-58.)  The three men drove away.  (Tr. IV, 39, 58.)  Petitioner was driving the car.

(Tr. IV, 39.)  Elliott testified that they pulled over when the police turned on their sirens.  (Tr. IV,

39.)  They ran away from the police because they did not want to be wrongly implicated or involved

in the shooting incident.  (Tr. IV, 40.)  Elliott admitted that he told the police that he did not know

anything about the shooting.  (Tr. IV, 36-37, 47-48, 69.)

Petitioner testified that he had seen Venson in the neighborhood a couple of times,

but did not know him.  (Tr. IV, 73.)  Toward the end of the Super Bowl, Petitioner went out to his

mother's car, a blue Oldsmobile 98.  (Tr. IV, 75.)  Initially, just Petitioner and Elliott were in the car

smoking marijuana, but they were joined by Nakiva Spruill and Tawana Fullerton.  (Tr. IV, 75-76.)

Petitioner heard the shots and could see two or three people.  (Tr. IV, 76-77.)  After the shots were

fired, the girls got out of the car and Petitioner moved to the driver's seat.  (Tr. IV, 77.)  Troy moved

into the front passenger seat and Darlynzo Brown came out of the house and got into the back seat.

(Tr. IV, 77-78.)  Petitioner testified that he and Elliott had planned to go to Elliott's "baby momma

house" on the west side.  (Tr, IV, 78.)  Petitioner admitted that he fled from the police when they

tried to stop his car because he had marijuana on him and there was a warrant out on Darlynzo

Brown.  (Tr. IV, 78-79.)    Petitioner denied that he shot Venson, but he could not identify the

shooter.  (Tr. IV, 73.)  Petitioner testified that he had never seen the gun that was used to shoot

Venson and he did not know how it got into the dog kennel.  (Tr. IV, 82.)  He admitted that he lied

to police when he told them that he was not driving the car.  (Tr. IV, 87, 91.)

Nakiva Spruill, a/k/a Nakiva Bates, testified that she had known Petitioner for several

years and was pregnant with his child.  (Tr. IV, 111-12.)  At the time of trial, she and Petitioner no

longer were involved in a romantic relationship.  (Tr. IV, 112.)  Spruill testified that she, Petitioner,

Elliott and Fullerton were in Petitioner's car smoking marijuana when she heard the shots. (Tr. IV, 113, 122.) Spruill testified that she did not look to see where the shots were coming from and did not see the shooter. (Tr. IV, 131-33, 135.) According to Spruill, Petitioner never got out of the car and she never saw a gun. (Tr. IV, 131-32.) She and Fullerton got out of the car after the shots were fired, crossed the street and walked to Spruill's house on Florence. (Tr. IV, 115.) Spruill felt safe walking home after the shots had stopped. (Tr. IV, 136.) Spruill saw the victim laying on the ground as they walked down Woodbury, but did not offer him any assistance or call the police because she did not want to get involved. (Tr. IV, 117, 138-40.) When Spruill arrived home on Florence, Damion Bates was there. (Tr. IV, 117.) Damion was her first cousin. (Tr. IV, 125.) Spruill did not recall seeing Venson or Damion Bates before the shooting. (Tr. IV, 128-29.)

Spruill testified that Detective Hatter interviewed her the evening following the shooting. (Tr. IV, 141.) Spruill admitted to telling Hatter the things in his report, but claimed that everything she told him about the shooting was untrue because she was not under oath when she was speaking to him. (Tr. IV, 142.) Spruill told Hatter that Bates also was in the car smoking marijuana. (Tr. IV, 141-42.) She also told Hatter that she saw the victim talking to someone across the street and then cross Woodbury in the direction of the victim's residence. (Tr. IV, 143.) The victim stopped and looked as if someone had called to him. (Tr. IV, 144.) Spruill told Hatter that the shooter appeared wearing black jogging pants, a black coat and a dark hat and mask on his face. (Tr. IV, 144.) The shooter approached the victim and shot him multiple times before running away down Woodbury. (Tr. IV, 144.)

On June 24, 1998, the jury returned a verdict of guilty on all charges. (Tr. V, 30.)

**B.      Direct Appeal**

- 14 -

Petitioner filed a notice of appeal and a motion for remand in the Michigan Court of Appeals to allow him to file a motion for a new trial in the state circuit court. Petitioner's motion was based upon newly discovered evidence, an affidavit prepared by Darlynzo Brown claiming that he, not Petitioner, was the shooter. The Michigan Court of Appeals denied Petitioner's motion on February 23, 1999, because Petitioner "failed to demonstrate by the affidavit presented that there is newly discovered evidence which would warrant a new trial in this case. MCR 7.211(C)(1)(a)." *People v. Frey*, No. 213511 (Mich. Ct. App. Feb. 23, 1999), docket #24. Petitioner filed a delayed application for leave to appeal in the Michigan Supreme Court challenging the court of appeals' denial of Petitioner's motion for remand. The Michigan Supreme Court denied Petitioner's application for leave to appeal on September 29, 1999, because it was "not persuaded that the questions presented should now be reviewed by this Court." *People v. Frey*, No. 114401 (Mich. Sept. 29, 1999), docket #24.

Petitioner raised the following four claims in the Michigan Court of Appeals:

I.    THE DEFENDANT WAS DENIED A FAIR TRIAL WHEN THE PROSECUTOR IMPEACHED THE DEFENSE WITNESSES BY QUESTIONING THEM AS TO WHY THEY HAD NOT COME TO THE POLICE BEFORE TRIAL WITH THE INFORMATION THEY POSSESSED CONCERNING THE INCIDENT THEREBY DENYING THE DEFENDANT OF DUE PROCESS PURSUANT TO US CONST AMS V, XIV; AND MICHIGAN CONST 1963, ART I § 17.

II.   THE PROSECUTOR ENGAGED IN PROSECUTORIAL MISCONDUCT WHEN DURING CROSS EXAMINATION SHE ELICITED TESTIMONY FROM THE DEFENDANT THAT HIS DEFENSE WITNESSES HAD VISITED HIM WHILE IN JAIL, THEREBY DENYING THE RIGHT TO DUE PROCESS PURSUANT TO US CONST AMS V, XIV; AND MICHIGAN CONST 1963, ART I § 17.

III.  THE PROSECUTOR ERRONEOUSLY CROSS[-]EXAMINE[D] THE DEFENDANT WHICH REVEALED THAT THE DEFENDANT MADE NO STATEMENT UPON ARREST THEREBY DENYING HIM DUE

PROCESS PURSUANT TO US CONST AMS V, XIV; AND MICHIGAN CONST 1963, ART I § 17.

IV.    DEFENDANT IS ENTITLED TO A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE.

(*See* Def.-Appellant's Br. on Appeal, docket #23.)  By unpublished opinion issued on February 8, 2000, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. *People v. Frey*, No. 213511 (Mich. Ct. App. Feb. 8, 2000)(MCOA Op.), docket #23. Petitioner filed an application for leave to appeal to the Michigan Supreme Court raising the same four claims raised before and rejected by the Michigan Court of Appeals, as well a new claim that he was denied the effective assistance of appellate counsel.  The Michigan Supreme Court denied Petitioner's application for leave to appeal on August 22, 2000, because it was not persuaded that the question presented should be reviewed by the court.  *People v. Frey*, No. 116552 (Mich. Aug. 22, 2000), docket #25.

On February 29, 2000, Petitioner moved for a rehearing in the Michigan Court of Appeals based upon newly discovered evidence.  The Michigan Court of Appeals granted Petitioner's motion on May 11, 2000, and remanded the matter to the Kalamazoo County Circuit Court for an evidentiary hearing on the newly discovered evidence so that a testimonial record could be created to support a motion for a new trial.  *People v. Fry*, No. 213511 (Mich. Ct. App. May 11, 2000), docket #23.  The state circuit court held an evidentiary hearing on September 26, 2000. Petitioner subsequently filed a motion for a new trial, which was denied by the trial court on February 21, 2001.

Petitioner filed an application for leave to appeal the trial court's order in the Michigan Court of Appeals, raising the following claim:

I.      THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION
        FOR NEW TRIAL ON THE BASIS OF NEWLY DISCOVERED
        EVIDENCE BECAUSE THE DEFENDANT PRESENTED TESTIMONY
        THROUGH DARYLNZO BROWN THAT HE WAS THE ACTUAL
        PERPETRATOR OF THE CRIME RATHER THAN THE [SIC] MR. FRY
        THEREBY EXONERATING MR. FRY FROM ANY WRONGDOING
        AND THE TESTIMONY FURTHER ESTABLISHED THAT MR. FRY
        COULD NOT WITH REASONABLE DILIGENCE HAVE PRODUCED
        THIS EVIDENCE AT HIS TRIAL.

(*See* Def.-Appellant's Br. on Appeal, docket #26.)   The Michigan Court of Appeals denied

Petitioner's application for leave to appeal on July 13, 2001.  *People v. Frey*, No. 233002 (Mich. Ct.

App. Jul. 13, 2001), docket #26.  Petitioner filed an application for leave to appeal in the Michigan

Supreme Court raising the following claims:

I.      THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION
        FOR NEW TRIAL ON THE BASIS OF NEWLY DISCOVERED
        EVIDENCE BECAUSE THE DEFENDANT PRESENTED TESTIMONY
        THROUGH DARLYNZO BROWN THAT HE WAS THE ACTUAL
        PERPETRATOR OF THE CRIME RATHER THAN MR. FRY THEREBY
        EXONERATING MR. FRY FROM ANY WRONGDOING AND THE
        TESTIMONY FURTHER ESTABLISHED THAT MR. FRY COULD NOT
        WITH REASONABLE DILIGENCE HAVE PRODUCED THE EVIDENCE
        AT TRIAL.

II.     THE DEFENDANT WAS DENIED A FAIR TRIAL WHEN THE
        PROSECUTOR IMPEACHED THE DEFENSE WITNESSES BY
        QUESTIONING THEM AS TO WHY THEY HAD NOT COME TO THE
        POLICE BEFORE TRIAL WITH THE INFORMATION THEY
        POSSESSED CONCERNING THE INCIDENT THEREBY DENYING THE
        DEFENDANT OF DUE PROCESS PURSUANT TO US CONST AMS V,
        XIV; AND MICHIGAN CONST 1963, ART I § 17.

III.    THE PROSECUTOR ENGAGED IN PROSECUTORIAL MISCONDUCT
        WHEN DURING CROSS EXAMINATION SHE ELICITED TESTIMONY
        FROM THE DEFENDANT THAT HIS DEFENSE WITNESSES HAD
        VISITED HIM WHILE IN JAIL, THEREBY DENYING THE RIGHT TO
        DUE PROCESS PURSUANT TO US CONST AMS V, XIV; AND
        MICHIGAN CONST 1963, ART I § 17.

- 17 -

IV. THE PROSECUTOR ERRONEOUSLY CROSS[-]EXAMINE[D] THE DEFENDANT WHICH REVEALED THAT THE DEFENDANT MADE NO STATEMENT UPON ARREST THEREBY DENYING HIM DUE PROCESS PURSUANT TO US CONST AMS V, XIV; AND MICHIGAN CONST 1963, ART I § 17.

(*See* Def.-Appellant's Br. on Appeal, docket #27.)  The Michigan Supreme Court denied Petitioner's

application for leave to appeal on March 4, 2002, because it was not persuaded that the questionss

presented should be reviewed by the court.  *People v. Frey*, No. 119765 (Mich. Mar. 4, 2002), docket

#27.

C.      **Post-Conviction Relief**

On December 3, 2002, Petitioner filed a motion for relief from judgment in the

Kalamazoo County Circuit Court raising the following claims:

I. DEFENDANT['S] STATE AND FEDERAL CONSTITUTIONAL RIGHTS [WERE] VIOLATED WHERE A SUGGESTIVE IDENTIFICATION WAS ALLOWED TO GO UNCORRECTED DURING HIS TRIAL PROCEEDINGS IN VIOLATION OF THE DEFENDANT'S DUE PROCESS OF LAW UNDER THE 14TH AMENDMENT AND WAS THE DEFENDANT'S RIGHT TO COUNSEL VIOLATED DURING A SUGGESTIVE PRETRIAL PHOTOGRAPHIC LINE-UP IN VIOLATION OF HIS 6TH AMENDMENT CONSTITUTIONAL RIGHT.

II. DEFENDANT WAS DENIED HIS 14TH AMENDMENT CONSTITUTIONAL AMENDMENT RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL WHEN THE TRIAL COURT FAILED TO CENSURE THE ADMITTANCE OF HIGHLY PREJUDICIAL PHOTOGRAPHS THAT WERE USED TO INFLAME THE PASSION OF THE JURY.

III. DEFENDANT WAS DENIED HIS 5TH AND 14TH CONSTITUTIONAL AMENDMENT RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL WHEN THE PROSECUTION MADE IMPERMISSIBLE CLOSING ARGUMENTS.

IV. DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL [WAS] VIOLATED WHERE FOR NUMEROUS REASONS (I.E. FAILURE TO OBJECT TO

- 18 -

PROSECUTORIAL MISCONDUCT TRIAL ERRORS AND/OR HIGHLY PREJUDICIAL EVIDENCE WAS COMMITTED DURING HIS TRIAL PROCEEDINGS.

V.    IT IS UNCONSTITUTIONAL FOR THE TRIAL COURT TO FAIL TO ADDRESS THE DEFENDANT['S] MOTION FOR RELIEF FROM JUDGMENT BY RELYING ON MCR 6.508(D)(3) AS IT INFRINGES UPON THE LEGISLATIVE INTENT.

VI.    DEFENDANT WAS DENIED DUE PROCESS AND EQUAL PROTECTION OF LAW [] UNDER THE 14TH AMENDMENT WHEN THE TRIAL COURT ABUSE[D] ITS DISCRETION AND IMPOSED A SENTENCE THAT WAS DISPROPORTIONATE.

VII.    THE CUMULATIVE EFFECT OF INEFFECTIVE ASSISTANCE OF COUNSEL PROSECUTORIAL MISCONDUCT AND TRIAL COURT ERRORS VIOLATE[D] DEFENDANT['S] CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE 6TH AND 14[TH] AMENDMENT[S].

(*See* Def.-Appellant's Br. on Appeal, docket #29.)  The circuit court denied Petitioner's motion on December 12, 2002.  The Michigan Court of Appeals and the Michigan Supreme court denied Petitioner's applications for leave to appeal on August 13, 2003 and April 30, 2004, respectively, because Petitioner failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  *People v. Frey*, No. 247120 (Mich. Ct. App. Aug. 13, 2003), docket #29; *People v. Frey*, No. 124895 (Mich. Apr. 30, 2004), docket #29.

While Petitioner's first motion for relief from judgment was pending in the Michigan Court of Appeals, he and the trial court received a letter from Kimberly Veen, a juror in Petitioner's trial, regarding alleged bias and misconduct on the part of another juror(s).  Petitioner moved for a stay of the appellate proceedings, which was denied on September 22, 2003.  *People v. Frey*, No. 247120 (Mich. Ct. App. Aug. 13, 2003), docket #28.  Petitioner then filed a motion in the trial court for an evidentiary hearing pursuant to MICH. CT. R. 6.502.  The trial court denied Petitioner's motion

- 19 -

on December 4, 2003. Petitioner filed an application for leave to appeal in the Michigan Court of

Appeals raising the following claim:

> DEFENDANT-APPELLANT WAS DENIED DUE PROCESS OF LAW WHEN
> THE TRIAL COURT DENIED DEFENDANT-APPELLANT'S MOTION FOR A
> NEW TRIAL/EVIDENTIARY HEARING BASED ON NEWLY DISCOVERED
> EVIDENCE OF JUROR IMPARTIALITY AND MISCONDUCT.

(*See* Def.-Appellant's Br. on Appeal, docket #30.)   The Michigan Court of Appeals denied

Petitioner's applications for leave to appeal on May 3, 2004, because Petitioner failed to meet the

burden of establishing entitlement to relief under MICH.CT.R. 6.508(D).   *People v. Frey*, No.

253385 (Mich. Ct. App. May 3, 2004), docket #30. Petitioner sought leave to appeal in the Michigan

Supreme Court, raising the following claims:

> I.     WAS IT APPROPRIATE FOR THE COURT OF APPEALS TO DENY
> APPELLANT AN EVIDENTIARY HEARING WHERE THE UNITED
> STATE CONSTITUTION IS CLEAR IN ITS PROVISO THAT A
> CRIMINAL DEFENDANT HAS A CONSTITUTIONAL RIGHT TO A
> FAIR AND IMPARTIAL JURY AND WHERE THE EVIDENCE
> WARRANTS [MAKING] A RECORD.
>
> II.    IS REPEATED PROSECUTORIAL MISCONDUCT WHICH IS BY
> DESIGN ENGAGED IN TO SHIELD INITIAL INEPT INVESTIGATION
> WHICH HAS LED TO THE CONVICTION OF AN ACTUALLY
> INNOCENT PERSON ACCEPTABLE UNDER MICHIGAN LAW.

(*See* Def.-Appellant's Br. on Appeal, docket #31.) The Michigan Supreme Court denied Petitioner's

applications for leave to appeal on December 29, 2004, because Petitioner failed to meet the burden

of establishing entitlement to relief under MICH.CT.R. 6.508(D).   *People v. Frey*, No. 126407 (Mich.

Dec. 29, 2004), docket #31.

- 20 -

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  "Yet, while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be  instructive in assessing the reasonableness of a state court's resolution of an issue."  *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the

petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943. However, the Sixth Circuit recently has clarified

that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer."  In such circumstances, the court conducts *de novo* review.  *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1);  *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).  Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

A.   **Newly Discovered Evidence: Ground I**

In his first ground for habeas corpus relief, Petitioner claims that the trial court erred by denying his motion for a new trial based upon newly discovered evidence that his cousin, Darlynzo Brown, was the shooter.  Petitioner raised this claim on direct appeal in the Michigan Court of Appeals.  In support of his claim, Petitioner provided an affidavit executed by Brown on October 5, 1998, in which Brown averred that he, not Petitioner, shot Venson.  The court of appeals initially ruled that the issue was not properly before it, noting that a motion for a new trial had not been filed

in the lower court, the court of appeals previous had denied a motion for remand and the affidavit was not a part of the lower court record.  Later, however, the court of appeals granted Petitioner's motion for a rehearing and remanded the matter to the Kalamazoo County Circuit Court for an evidentiary hearing on the newly discovered evidence.

The state circuit court held an evidentiary hearing on September 26, 2000.  At the hearing, Brown testified that he was Petitioner's cousin.  (Evidentiary Hearing Transcript ("EH Tr."), 11, docket #22.)  Brown testified that on October 5, 1998, after Petitioner's conviction, he went to an attorney's office with family members for the purpose of executing an affidavit admitting that he was the shooter.  (EH Tr., 12-15.)  Brown stated that everything in the affidavit was true and that he executed the affidavit because Petitioner had been convicted of something that he did not do.  (EH Tr., 17.)  Brown testified that he was the actual shooter in this case.  (EH Tr., 17-18.)  Brown never informed Petitioner's lawyer during the trial that he (Brown) was the shooter.  (EH Tr., 18.)  Brown testified that in March 1998, he failed to appear for sentencing on a probation violation and drug case.  He was not arrested until April of 2000, almost two years later.  (EH Tr., 18, 45.)  During that time, Brown had two children with Anita Hill and was at her home on a daily basis.  (EH Tr., 41-46.)  Brown testified that he received a subpoena from the prosecutor's office to testify at Petitioner's trial in June 1998, but he failed to appear.  (EH Tr., 54-55.)  According to Brown, defense counsel never contacted him directly regarding his failure to appear for trial.  (EH Tr., 55.)  Brown received information regarding the trial on a daily basis from family members.  (EH Tr., 62.)  Brown learned of the guilty verdict about fifteen minutes after it was handed down.  (EH Tr., 62.)  He did not come forward during Petitioner's trial because he believed that Petitioner would be found not guilty.  (EH Tr., 58-59.)

On cross-examination, the Prosecutor asked Brown to describe the events leading up to the shooting. Brown testified that he was standing in front of his house at 817 Woodbury, while Damion Bates and the victim were across the street talking. (EH TR., 19.) Brown called Bates over and asked him for a light. (EH Tr., 19.) According to Brown, the victim walked over with Bates. Brown testified that after he was done talking to Bates, he asked the victim why he came over because Brown had not called him. (EH Tr., 20.) The victim started to say something and Brown told him to leave from the front of his house. Brown testified that instead of leaving, the victim starting walking toward him. Brown pulled out a sawed-off shotgun and shot the victim. (EH Tr., 20, 25.) Brown was wearing a three-quarter length coat that day and hid the weapon underneath his coat. (EH Tr., 21-23.) According to Brown, Petitioner was down the street in a car when the shooting occurred. (EH Tr., 28.) After he shot the victim, Brown ran to the car. (EH Tr., 27.) Brown denied that he was inside the house at the time of the shooting. (EH Tr., 32-33.) Brown admitted to lying to Detectives Alofs and Hatter during an interview on the day of the shooting when he told them that he was not the shooter, that he was in the house at the time of the shooting and that the gun used in the shooting was not his. (EH Tr., 35-37, 39.) Brown also admitted that in 1997, he lied under oath in an unrelated case. (EH Tr. 35.)

In addition to his affidavit, Brown prepared a video tape in 1999 in which he admitted to being the shooter in this case. (EH Tr., 48-50.) Brown never went to the police or prosecutor with his version of the shooting, and refused to talk to Detective Alofs about his affidavit. (EH Tr., 47.) At the time of the hearing, Brown was serving sentences of two to twenty years on the probation violation and two to six years on the drug conviction. (EH Tr., 60.) Brown testified that he and Petitioner do not look alike. (EH Tr., 30.)

- 25 -

The other witnesses at the evidentiary hearing were Detective Alofs, who interviewed Brown shortly after the shooting and two polygraph examiners. One of the polygraph examiners, Kevin Vaughn, administered a polygraph exam to Brown regarding his affidavit. Vaughn interpreted the polygraph results as being deceptive. (EH Tr., 99.) The second examiner, Lawrence Downey, was not present at the exam, but reviewed the results and agreed with Vaughn's interpretation of the results as being deceptive. (EH Tr., 113.)

Petitioner subsequently filed a motion for new trial, which was denied by the trial court on February 14, 2001. (Op. & Order Denying Def.'s Mot. for a New Trial, docket #26.) The trial court concluded that based upon the evidence presented at the hearing, Brown was not a "newly discovered" witness because he was available and could have been produced by Petitioner at trial. The trial court further noted several inconsistencies between the trial testimony of the defense witnesses and Brown's version of the events surrounding the shooting. For example, none of the witnesses who testified at trial placed Brown at the scene of the crime. In addition, Brown admitted at the evidentiary hearing that he told detectives shortly after the shooting that he was not the shooter and the gun did not belong to him. The court also noted that two polygraph examiners interpreted the results of Brown's polygraph examination as "deceptive." The court concluded that Brown's purported confession was untrustworthy and unlikely to cause a different result in a new trial. The Michigan Court of Appeals and the Michigan Supreme Court denied Petitioner's applications for leave to appeal the trial court's decision denying his motion for a new trial.

To the extent Petitioner claims that he is entitled to a new trial under Michigan law, he presents a state-law claim that is not cognizable for purposes or habeas corpus review. *See Estelle v. McGuire*, 502 U.S. 62 (1991). Petitioner's claim of actual innocence also fails to state a cognizable federal claim. In *Herrera v. Collins*, 506 U.S. 390, 400 (1993), the Supreme Court

stated: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." But the *Herrera* Court did not close the door completely, stating in dicta: "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417. Thus, even without the occurrence of any independent constitutional violation during the state criminal proceeding, federal habeas relief might be warranted for "truly persuasive demonstration of actual innocence," provided: (1) the habeas petition seeks relief in a capital case, in which case such a demonstration of actual innocence "would render the execution of a defendant unconstitutional"; and (2) there is "no state avenue open to process such a claim." *Id.* The Supreme Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.*; *see also House v. Bell*, 547 U.S. 518, 555 (2006) ("In *Herrera*, however, the Court described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'"); *Cress v. Palmer*, 484 F.3d 844, 854-55 (6th Cir. 2007).

Two years after *Herrera,* the Supreme Court held that a claim of actual innocence can be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence

claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 (citing *Herrera*, 506 U.S. at 404). Thus, the Supreme Court distinguished between a procedural innocence claim, which can permit a petitioner to overcome procedural obstacles that would otherwise preclude review of underlying constitutional claims, and a substantive or "free-standing" claim of innocence discussed in *Herrera*.

This Court may grant habeas corpus relief only when the state court has violated or unreasonable applied a clearly established holding of the Supreme Court. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412. In the absence of clearly established Supreme Court precedent establishing a free-standing claim of actual innocence, Petitioner's claim is without merit. The Sixth Circuit repeatedly has held that free-standing claims of actual innocence are not cognizable on habeas corpus review. *See Cress*, 484 F.3d at 854 (citing cases). Even if Petitioner could invoke this exception and obtain habeas relief on his freestanding innocence claim, he would have to meet both of the requirements set forth above and then overcome the "extraordinarily high" threshold. Petitioner fails the first requirement. This is not a capital case, and thus, the concern about the unconstitutionality of executing a defendant who has shown persuasive evidence of actual innocence is not implicated. *See Herrera*, 506 U.S. at 417 ("We first point out the obvious - that this is not, in fact, a capital case."). Petitioner, therefore, cannot obtain habeas corpus relief on his freestanding claim of actual innocence.

Petitioner also is unable to show actual innocence as a means of overcoming his procedural default. As discussed in greater detail below, a majority of Petitioner's claims were procedurally defaulted in the state courts. If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state

procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House*, 547 U.S. at 536*; Murray*, 477 U.S. at 495; *Hicks v. Straub*, 377 F.3d 538, 551-52 (6th Cir. 2004). The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536-37.

In determining whether an applicant has met the requirements for establishing a cognizable claim of actual innocence in order to obtain review of a procedurally defaulted claim, the court must apply the actual-innocence standard developed in *Schlup*. *See Souter v. Jones*, 395 F.3d 577, 596 (6th Cir. 2005). Under *Schlup*, the petitioner "must show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327 ("[T]he standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."); *see also Souter*, 395 F.3d at 602. "[T]o be credible a gateway claim requires new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." *House*, 547 U.S. at 537 (internal quotation marks omitted). The Court must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *Id.* (internal quotation marks omitted). "[T]he *Schlup* standard is demanding and permits review

only in the 'extraordinary' case." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327) (internal

quotation omitted).

In light of the evidence, I find that Petitioner failed to establish that it is more likely

than not that no reasonable juror would have convicted him.  As discussed above, there were

significant inconsistencies between the trial testimony of the defense witnesses and Brown's version

of the events surrounding the shooting.  None of the defense witnesses placed Brown at the scene

of the shooting.  Petitioner, Troy Elliott and Navika Spruill testified that they were in a parked car

together with Tawana Fullerton when the shooting occurred. (Tr. IV, 37-38, 49-50, 75-77, 113, 122.)

Petitioner and Elliott testified that Brown came out of the house and got into the car after the

shooting occurred. (Tr. IV 57-58, 77-78.)  Spruill testified that she and Fullerton got out of the car

and left immediately after the shooting occurred. (Tr. IV, 115.)  She never saw Brown before or after

the shooting. (Tr. IV, 123, 134-35.)

Furthermore, Brown's testimony at the evidentiary hearing regarding the events

surrounding the shooting differed significantly from the trial testimony of the victim and Damion

Bates, who was standing next to the victim when he was shot.  Brown testified at the evidentiary

hearing that he called Bates over from across the street and asked him for a light.  (EH Tr., 19.)

According to Brown, the victim walked over with Bates.  Brown testified that after he was done

talking to Bates, he asked the victim why he came over because Brown had not called him. (EH Tr.,

20.)  The victim started to say something and Brown told him to leave from the front of his house.

Brown testified that instead of leaving, the victim starting walking toward him.  Brown pulled out

a sawed-off shotgun and shot the victim.  (EH Tr., 20, 25.)  The victim and Bates testified that the

shooter walked up to them while they were standing on the sidewalk in front of 829 Woodbury.  (Tr.

II, 138-39; Tr. III, 162.)  The victim testified that the shooter asked for a light.  (Tr. II, 139.)  After Damion gave him a light for his cigarette, the shooter turned around as if he was going to walk away. (Tr. II, 140.)  The shooter turned back around holding a shotgun and asked the victim what he was doing out there.  The victim responded that he was talking about religion and Allah.  (Tr. II, 142.) According to the victim, the shooter said, "No, [you're] not," and starting firing the shotgun at the victim.  (Tr. II, 142.)  Bates testified at trial that the shooter walked up and asked what they were talking about.  (Tr. III, 162.)  Bates said, "nothin' " and the shooter pulled a .12 gauge shotgun out of his coat and shot the victim.  (Tr. III, 162, 166-67.)

In addition, the victim positively identified Petitioner in a photographic lineup and at trial.  While he was in the hospital, the victim picked Petitioner out of a photographic lineup in less than a minute.  (Tr. II, 183, 192.)  At trial, the victim testified that he had seen Petitioner thirty times in the neighborhood before the shooting and stated that he was absolutely certain that Petitioner was the shooter.  (Tr. II, 149-50.)  Brown admitted that he and Petitioner did not look alike (EH Tr., 30), which reduces the possibility of a mistaken identification by the victim.  Brown also admitted at the evidentiary hearing that he told detectives shortly after the shooting that he was not the shooter, that he was in the house at the time of the shooting and the gun did not belong to him. (EH Tr., 35-37, 39.)  Brown also admitted lying under oath in an unrelated case.  (EH Tr., 35.)  In addition, two polygraph examiners interpreted the results of Brown's polygraph as "deceptive."  (EH Tr., 99, 123.)

Thus, Petitioner has failed to present evidence sufficient to establish that this Court's refusal to hear the defaulted claims would be a "miscarriage of justice."  *Schlup*, 513 U.S. at 326.

While Petitioner cannot meet the high threshold for a reliable claim of actual innocence, the Court will consider below whether he shown "cause and prejudice" for his defaulted claims.

B.    **Prosecutorial Misconduct: Grounds II, III, IV, VII**

Petitioner asserts four separate instances of prosecutorial misconduct.  In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and  whether a curative instruction was given by the court.   *See id.* at 12-13 (1985); *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

1.    Petitioner claims in Ground II that the prosecutor engaged in prosecutorial misconduct when he impeached the testimony of defense witnesses Troy Elliott and Nakiva Spruill by questioning them as to why they did not go to the police with the information they had concerning the shooting that would have exculpated Petitioner.  Both witnesses testified at trial for the defense that they were with Petitioner in a parked car when Mr. Venson was shot, and, thus, Petitioner could not have been the shooter.

Petitioner raised his claim on direct appeal, but the Michigan Court of Appeals found the issue unpreserved for appellate review because Petitioner did not object to the prosecutor's cross-examination of either witness.  Applying a limited review for unpreserved error, the court concluded that Petitioner failed to show a plain error that affected his substantial rights.  The court of appeals stated:

Defendant failed to properly preserve this issue for appeal by an objection to the prosecutor's cross-examination of either witness.  However, review may be granted if failure to consider the issue would result in manifest injustice. *People v Grant*, 445 Mich 535, 547; 520 NW2d 123 (1994); *People v Nimeth*, 236 Mich App 616, 625; ___ NW2d ___ (1999). A plain unpreserved error may not be considered by an appellate court for the first time on appeal unless the error could have been decisive of the outcome or unless it falls under the category of cases where prejudice is presumed or reversal is automatic. *Id.* This Court will only reverse when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id.*, citing to *United States v Olano*, 507 US 725; 113 S Ct 1770; 123 L Ed 2d 508 (1993).

"On numerous occasions, this Court has held that the credibility of a witness may be attacked by showing that he failed to speak or act when it would have been natural to do so if the facts were in accordance with his testimony." *People v Martinez*, 190 Mich App 442,446; 476 NW2d 641 (1991). "Therefore, a prosecutor may question an alibi witness regarding why he did not come forward with his story before trial after the prosecutor has shown it would have been natural for the witness to come forward." *Id.* Further, this Court has held that a prosecutor may also cross-examine a non-alibi witness regarding why he did not come forward with information about which a witness is testifying at trial, if the information is of such a nature that the witness would have a "natural tendency to come forward with it." *People v Perkins*, 141 Mich App 186, 196; 366 NW2d 94 (1985).

We find that the prosecutor's questions were not improper. Elliott and Spruill testified to information of such a nature that, if true, the witnesses would have had a "natural tendency to come forward" with it before trial. *People v Emery*, 150 Mich App 657, 666-667; 389 NW2d 472 (1986).  Applying the factors set forth in *Emery*, we find that both witnesses have a close relationship with defendant. Elliott testified that he was best friends with defendant and Spruill testified as defendant's girlfriend. Both witnesses were present during the time defendant allegedly committed the crime; therefore, they had personal knowledge of the events. Their presence during the shooting tended to implicate them in the wrongdoing. By coming forward, they might exonerate themselves as well as defendant. Finally, both witnesses were given the opportunity to speak to the police without having to take the initiative in seeking

the police on their own:  Elliott was arrested at the same time as defendant and the police went to Spruill's house to question her about the shooting. Instead of offering the information about which she later testified, Spruill made several statements which she later admitted were lies. *Id.* Defendant has failed to show a plain error that affected his substantial rights. *Grant,supra.*

(MCOA Op., 2-3.)

Respondent contends that Petitioner procedurally defaulted his claim by failing to preserve the issue for review in the state appellate courts.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks*, 377 F.3d at 551; *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim.  It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial.  *See, e.g.*, *People v. Kelly*, 423 Mich. 261, 271 (1985).  A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee*, 534 U.S. at 385.  Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court.  *See Wainwright v. Sykes*, 433 U.S. 72,

86-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).

Petitioner argues that the Michigan Court of Appeals waived his default by reaching the merits of

his claims.  However, even when the court of appeals applies a limited review of the claimed error

to determine whether it affected the outcome, Petitioner's failure to object is still considered a

procedural default. *See Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004); *Clifford v. Chandler*, 333

F.3d 724, 728-29 (6th Cir. 2003), *overruled in part on other grounds by Wiggins*, 539 U.S. 510

(citing *White v. Schotten*, 201 F.3d 743 (6th Cir. 2000), and *Scott v. Mitchell*, 209 F.3d 854 (6th Cir.

2000)); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989); *accord Federico v. Yukins*, No. 93-

2424, 1994 WL 601408, at *3-4 (6th Cir. Nov. 2, 1994).  Accordingly, review by this court is barred

unless Petitioner can show cause and prejudice. *See House*, 547 U.S. at 536*; Murray*, 477 U.S. at

495; *Hicks*, 377 F.3d at 551-52.

         For cause, Petitioner claims that his trial counsel was ineffective for failing to make

a contemporaneous objection.  To serve as cause to excuse the default, a claim of ineffective

assistance of counsel must be properly exhausted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000);

*Buell*,  274 F.3d at 349; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001).  Petitioner first

raised his claim of ineffective assistance of counsel in his 2002 motion for relief from judgment.  He

also raised the issue at all levels of appellate review; thus, the claim was exhausted.  However,

because the Michigan Court of Appeals and the Michigan Supreme Court rejected his applications

pursuant to MICH.CT.R.  6.508(D), his claim of ineffective assistance of counsel also is procedurally

defaulted.  Under MICH.CT.R.  6.508(D)(2) and (3), a defendant may not collaterally attack a

conviction based upon claims that were decided against him in a prior appeal or that could have been

raised on direct appeal.  For claims that could have been raised, the defendant is entitled to relief

only if he can establish "good cause" for failing to raise the grounds on appeal and "actual

prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." MICH.CT.R.  6.508(D)(3)(a)-(b).

In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been apprised of the procedural rule's existence.  *Luberda v. Trippett*, 211 F.3d 1004, 1006-07 (6th Cir. 2000).  Because MICH.CT.R.  6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place some time thereafter, MICH.CT.R. 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action.  *See  Luberda*, 211 F.3d at 1007; *Rogers v. Howes*, 144 F.3d 990, 994 (6th Cir. 1998).  Accordingly, Petitioner's claim of ineffective assistance of counsel also is procedurally defaulted.

For Petitioner to use the claim of ineffective assistance of counsel as "cause" for failing to preserve his claim of prosecutorial misconduct, he must first meet the "cause" and "prejudice" standard for the claim of ineffective assistance of appellate counsel itself.  *See Edwards*, 529 U.S. at 453; *Coleman*, 244 F.3d at 538; *Lancaster*, 324 F.3d at 436-37; *Clifford*, 333 F.3d at 729. Petitioner did not assert cause for failing to raise his claim of ineffective assistance of counsel on direct appeal.  Where a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).  Even if Petitioner could show cause, he cannot establish prejudice arising from the prosecutor's cross-examination of Elliott and Spruill.  As thoroughly discussed by the Michigan Court of Appeals, it was entirely proper for the prosecutor to question Elliott and Spruill as to why they never told the police that Petitioner was in the car with them when they saw someone else shoot the victim, particularly when they each shared a close personal relationship with Petitioner.  The

prosecutor's questions were permissible under Michigan law and Petitioner cannot show that the

decision of the court of appeals was contrary to clearly established Supreme Court precedent.

       2.     In Ground III, Petitioner claims that the prosecutor engaged in

misconduct when, during cross-examination, she elicited testimony from Petitioner that his defense

witnesses had visited him in jail.  During cross-examination, the following exchange took place

between the prosecutor and Petitioner (verbatim):

> Q:     Well, Jeffrey, let's talk about this.  On the day in question
> you're in the car.  Are you there in the car for over an hour,
> like Troy Elliott said?
>
> A:     Yes, we were in there for a pretty long time.
>
> Q:     Okay.  By the way, have you had any visitors out at the jail
> with you?
>
> A:     Yes.
>
> Q:     And has Nakiva been coming out to visit you?
>
> A:     She ain't came in about three months.
>
> Q:     Okay.  Did you talk to her about this case?
>
> A:     No.
>
> Q:     Tell her to get your witnesses together?
>
> A:     No.
>
> Q:     No?
>
> A:     No.  I mean -
>
> Q:     How about Troy Elliott, has he come to visit you?
>
> A:     He came with Navika once.
>
> Q:     Okay.  How about Tawana, has she come?

A:      No.

Q:      Okay.  So you're there in the car smoking dope . . . .

(Tr. IV, 83.)  Defense counsel did not make a contemporaneous objection to the prosecutor's line

of questioning.  However, after Petitioner stepped down from the stand and the jury was dismissed,

counsel moved for a mistrial as the result of the prosecutor's references to Petitioner being in jail.

(Tr. IV, 97-100.)  The trial court found that the prosecutor's purpose in asking the questions was not

to highlight Petitioner's present incarceration, but to determine whether Petitioner had the

opportunity to communicate with defense witnesses before trial.  The court denied the motion, but

offered to give a cautionary instruction to the jury.  (Tr. IV, 99-100.)

The Michigan Court of Appeals rejected Petitioner's claim, stating:

Next, defendant argues that he was denied a fair trial when the prosecutor introduced testimony that defendant had been or was in jail at the time of trial. Defendant argues that the trial court erroneously denied defendant's motion for a mistrial. We disagree. We review a trial court's denial of a motion for a mistrial for abuse of discretion. *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995). The test for prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. *People v Paquette*, 214 Mich App 336, 342; 543 NW2d 342 (1995).

We are not persuaded that questioning by the prosecutor constituted error mandating reversal.  A mistrial is warranted only where a defendant would otherwise be denied a fair trial. *Haywood, supra* at 228. The prosecutor's inadvertent use of the words "in jail," when inquiring whether defendant and his witnesses had the opportunity to compare stories in order to present a consistent alibi at trial, did not raise an inference that defendant had served time for prior offenses. The jury already knew that defendant had been arrested, handcuffed, and placed in custody for the specific offenses for which he was on trial because this evidence was admitted through the testimony of the various police officers involved in the case.

Finally, the trial court found that the prosecutor's reference to defendant being in jail was inadvertent. Therefore, this case is distinguishable from those cases where the prosecutor acted in bad faith in a calculated attempt to prejudice the jurors or violated a pretrial order. *See People v Greenway*, 365 Mich 547, 551; 114 NW2d 188 (1962), *People v Spencer*, 130 Mich App 527, 536; 343 NW2d 607 (1983), and *People v Camel*, 11 Mich App 219, 221-222; 160 NW2d 790 (1968). We find that

defendant was not denied a fair and impartial trial by the prosecutor's inadvertent remark. The trial court did not abuse its discretion when it denied defendant's motion for a mistrial.

(MCOA Op. at 3.)

Petitioner cannot show that he was denied a fair trial as the result of the prosecutor's references to Petitioner being in jail.  As noted by the court of appeals, the jury was aware from the testimony of various police officers that Petitioner has been taken into custody for the offenses charged in this case and was taken to jail.  The prosecutor's questions may have led the jury to conclude that Petitioner remained incarcerated on the charges in this case, but they did not raise the inference that Petitioner had been incarcerated for offenses unrelated to this case.  Given the serious nature of the charges in this case, it is not surprising that Petitioner was held in jail pending his trial. Moreover, the trial court's finding that the prosecutor's references to Petitioner being in jail were inadvertent is entitled to a presumption of correctness.  The trial record supports a finding that the prosecutor's purpose in asking the questions was to learn whether Petitioner and his key defense witnesses had an opportunity to discuss the case and coordinate their story.  Consequently, I cannot find that the decision of the court of appeals was not an unreasonable application of clearly established Supreme Court precedent.

3.     Petitioner argues in Ground IV that during cross-examination of Petitioner, the prosecutor improperly elicited testimony indicating that Petitioner made no statement upon his arrest in violation of his Fifth and Fourteenth Amendment rights.  In support of his claim, Petitioner relies upon the following excerpts from the prosecutor's cross-examination of Petitioner (verbatim):

Q:     So you admit that you fled from the police.

A:     Yes.

Q:      Mr. Fry, you had every opportunity to stop that car from Woodbury to Staple Street when the police are pursuing you; is that right?

A:      I mean, we didn't see the police unit we got Simpson and she was coming towards us, and when we turned away, we didn't see.

Q:      You turned towards her direction?

A:      Yes.

Q:      Well, did you get out of the car Mr. Fry, and say, "I just left Woodbury. There's a guy on the roadway."

A:      No.

Q:      Is this -- I mean, I get the impression --  or strike that.  Is this an everyday occurrence in your life to see this kind of event.

A:      I mean, stuff happens like that.  In mean, you don't want to be involved in -- see, people --

Q:      You don't want to get involved?

A:      No.  People come looking for you if you get involved with stuff like that, you know what I'm sayin'.

Q:      You're involved because you were right there.  There jurors weren't there.

A:      I'm not no witness to that, you know.  I didn't see what really happened.  Did I see who did it?  I didn't see who did it.

                                    ***

Q:      Mr. Fry, did you go to the police?

A:      No, we went, why am I going to go to the police?

Q:      When you're interviewed by the police, you end up lying to them; is that right?

A:      I didn't make no statement to the police.

Q:      You told them you weren't driving the car?

A:      Yeah.

- 40 -

Q:      And that you were smoking marijuana and that you didn't know the other
        people in the car.

A:      I didn't never say that.

Q:      You never told them that?

A:      No, I didn't.  I knew who was in my car.

Q:      All right.  So you can't offer an explanation as to how the gun got there.

A:      No. I cannot.

Q:      And you never went to the police to tell them that you were sitting in a car
        when the shooter came up to Jermaine?

A:      I mean, no, I did not.  I didn't tell the police nothing.  I didn't know nothing.
        I didn't see nothing.  I'm not no eyewitness to nothing.

                                        ***

Q:      Okay.  Okay.  Nobody calls the police.

A:      You don't think the police is right there on the scene?

Q:      So they're there quickly?

A:      They're there in less than three seconds basically.

Q:      Well, what is it that you're afraid of, Mr. Fry?  The police are there.  There's
        not going to be any more shooters around.  Your safety is no longer a
        concern.  Why can't you get out of the car and tell the police that the guy ran
        down the road?

(Tr. IV, 85-87, 90.)

        Because Petitioner did not object to the prosecutor's line of questioning at trial, the

Michigan Court of Appeals found the issue unpreserved for appellate review.  The court further

concluded that Petitioner failed to show that the prosecutor's conduct constituted plain error that

affected a substantial right.  The court stated:

Next, defendant argues that the prosecutor improperly asked defendant on cross-examination why he neglected to express his innocence to officers at the time of his arrest. Defendant did not object at trial to this line of questioning. The standard of review of a constitutional unpreserved issue requires that the defendant must show a plain error that affected substantial rights. *People v Carines*, 460 Mich 750; 597 NW2d 130 (1999). This Court will reverse only when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Olano, supra*, 507 US 725; *Grant, supra*, 535.

After reviewing the record, this Court finds that defendant has not shown a plain error that affected substantial rights. The prosecutor's questions only addressed defendant's silence and nonresponsive conduct before his arrest. The admission of testimony concerning a defendant's silence before custodial interrogation and before the *Miranda* warnings have been given is not a violation of a defendant's constitutional rights. *People v Schollaert*, 194 Mich App 158, 164; 486 NW2d 312 (1992). Accordingly, defendant's silence was not constitutionally protected and defendant's rights were not violated by the prosecutor's questions during cross-examination.

(MCOA Op. at 3-4) (footnote omitted.)

For the same reasons set forth above, Petitioner procedurally defaulted his claim by failing to raise an objection at trial. Thus, review by this court is barred unless Petitioner can show cause and prejudice. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 485. For cause, Petitioner claims that his trial counsel was ineffective for failing to make a contemporaneous objection. As discussed above, Petitioner's claim of ineffective assistance of appellate counsel also is procedurally defaulted because it was raised for the first time in his motion for relief from judgment. Consequently, Petitioner must first meet the "cause" and "prejudice" standard for the claim of ineffective assistance of appellate counsel. *See Edwards*, 529 U.S. at 453; *Coleman*, 244 F.3d at 538; *Lancaster*, 324 F.3d at 436-37. Petitioner does not assert cause for failing to raise his claim of ineffective assistance on direct appeal. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy*, 757 F.2d at

100.  Even if Petitioner could establish cause, he cannot show prejudice arising from the prosecutor's conduct because it did not violate his constitutional rights.

In *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), the Supreme Court held "that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment."  The theory underlying *Doyle* is that while *Miranda* warnings contain no express assurance that silence will carry no penalty, "such assurance is implicit to any person who receives the warnings." *Id.* at 618.  On this reasoning, the Court concluded that it would be fundamentally unfair first to induce a defendant to remain silent through *Miranda* warnings and then to penalize the defendant who relies on those warnings by allowing the defendant's silence to be used to impeach an exculpatory explanation offered at trial. *Id.*  However, *Doyle* applies only in the context of post-*Miranda* silence.  In cases following *Doyle*, the Supreme Court held that the Fifth and Fourteenth Amendments permit a defendant to be impeached with his prearrest pre-*Miranda* silence, *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980), or postarrest pre-*Miranda* silence, *Fletcher v. Weir*, 455 U.S. 603, 607 (1982), if he later takes the stand during his criminal trial.  In this case, Petitioner does not allege that he was given *Miranda* warnings immediately upon his arrest.  Therefore, the prosecutor was free to impeach Petitioner with his silence at the time of his arrest.  Accordingly, I find that the decision of the Michigan Court of Appeals was not an unreasonable application of clearly established Supreme Court precedent.

4.     In Ground VII, Petitioner argues that the prosecutor violated his rights to due process and a fair trial when she repeatedly stated during her closing argument that Petitioner and his witnesses were liars.  In her closing argument, the prosecutor stated in part:

> Look at the liars; look at all the admitted liars that the defense -- and I have ro admit,
> I produced Damion Bates, a person that you as the jurors would undoubtedly wanted

- 43 -

to have heard from because he was standing right next to the victim, Jermaine Venson. What does he say? He admits that he lied. Troy Elliott admits that he lied. Navika Spruill Bates admits that she lied. The defendant, Jeffrey, lie. All admit that they lied. They're a bunch of liars.

And why do they feel that they have to lie, ladies and gentlemen? They have to lie because they know that Jeffrey Fry is involved in the case. He was the assailant. He's the one, ladies and gentlemen, that had the gun when he shot Jermaine Venson. The only reason they had to lie is to somehow cover up and protect Jeffrey Fry, ladies and gentlemen. They were all lying at the time.

\*\*\*

Well, what is that you're going believe about Damion? They're all liars, ladies and gentlemen. They're all lying. And they're lying to protect Jeffrey Fry.

\*\*\*

You've got to look at the credibility of these witnesses, ladies and gentlemen. The defense chose to put on this defense. All of their witnesses were lying. And the only reason they're lying is because they know Jeffrey Fry was involved, ladies and gentlemen.

(Tr. II, 169-70, 202.)

Petitioner raised this claim of prosecutorial misconduct for the first time in his motion for relief from judgment. As previously discussed, the Michigan appellate courts relied upon MICH.CT.R. 6.508(D) in rejecting Petitioner's applications for leave to appeal the trial court's denial of his motion for relief from judgment. Consequently, Petitioner's claim is procedurally defaulted and his claim cannot be reviewed by the Court unless he can show cause and prejudice. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 485. Petitioner appears to argues ineffective assistance of appellate counsel as cause for his failure to raise this claim in his direct appeal. Petitioner did not raise the issue of ineffective assistance of appellate counsel in the Michigan courts; therefore, the claim is unexhausted. See *Duncan v. Henry*, 513 U.S. 364, 365 (1995). Under Michigan law, a defendant may file only one motion for relief from judgment. *See* MICH.CT.R. 6.508(G). Because

- 44 -

Petitioner already has filed his one allotted motion, he no longer has an available remedy in the state courts.  Thus, his claim of ineffective assistance of appellate counsel also is procedurally defaulted.  *See Cone v. Bell*, 243 F.3d 961, 967 (6th Cir. 2001), *rev'd on other grounds*, 535 U.S. 635 (2002) ("If the claims presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but are procedurally barred.").  As a result, Petitioner first must show cause and prejudice for his failure to raise his claim of ineffective assistance of appellate counsel.  Petitioner has failed to argue cause for his default.  Where a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Engle*, 456 U.S. at 134 n.43; *Leroy*, 757 F.2d at 100.  Regardless, Petitioner cannot show prejudice for his default.

The Supreme Court, in *Darden v. Wainwright*, 477 U.S. 168, 181-182 (1986), held that a prosecutor's references in closing argument to the petitioner being an "animal" that should not be let loose, and that was in need of a "leash," did not render petitioner's trial fundamentally unfair.  The Supreme Court stressed that the prosecutor's argument "did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent."  *Id.*  In this case the prosecutor's comments were based on the admitted testimony of Petitioner and key defense witnesses that they lied to police in connection with this case.  Petitioner does not claim that the prosecutor was arguing facts not in evidence.  As in *Darden*, the prosecutor's remarks did not manipulate or misstate the evidence, nor did they implicate other specific constitutional rights.  The Sixth Circuit recently found that the prosecutor did not engage in misconduct by referring to the defendant's alibi witnesses as "liars" when the prosecutor argued from the evidence to contend that each person's testimony should not believed.  *Cristini v. McKee*,

__ F.3d. ___, 2008 WL 2129742, at *11-12 (6th Cir. May 22, 2008); *see also Givens v. Yukins*, No. 98-2429, 2000 WL 1828484, at *7 (6th Cir. Dec. 5, 2000) (referring to the petitioner as a liar, thief, drug kingpin, and prostitute in closing argument did not constitute prosecutorial misconduct when the prosecutor's comments were supported by evidence admitted at trial).  Moreover, because the jury heard Petitioner and his defense witnesses admit to lying to police during their testimony, I cannot find that Petitioner was actually prejudiced by the prosecutor's references to them as "liars" in her closing argument.

### C.    Identification:  Ground V

Petitioner claims in Ground V that his due process rights were violated when a suggestive photographic identification was allowed to go uncorrected during his trial.  He further claims that his Sixth Amendment right to counsel was violated when police conducted a photographic lineup without the presence of counsel.  Petitioner also contends that his defense counsel was ineffective for failing to move for suppression of the tainted identification.

Petitioner's claim begins with the trial testimony of Officer Seifferly regarding her conversation with the victim shortly after the shooting occurred.  Seifferly testified on direct examination (verbatim):

Q:    Okay.  All right.  Thank you.  Did you talk to him?

A:    Yes.

Q:    What did he say?

A:    Um, again he's -- he's worried that he's gonna die.  Um he wants me to assure him that he's not gonna die.  Um, he wants -- he wants to go to the hospital.  Um,

Q:    Is he cooperative?

A:    Yes, he's very cooperative.

Q:      All right.

A:      More alert than I thought he would be.

Q:      Go ahead.

A:      Um, I asked him who shot him.  And, at that point, he said, the guys -

        Defense Counsel: Your Honor, I'm going to object to hearsay at this point.

                                        ***

Q:      Officer Seifferly, could you explain the the jury, first of all, the manner in
        which the questioned were asked and what he -- how he responded?

A:      Um, we kept -- well, I wanted to make him keep talking.  We didn't want him
        to lose consciousness; so, we were asking questions.  And, when I asked him
        who shot him at point blank he said, the guys next door.

Q:      All right.

        Defense Counsel:  I'm sorry?

A:      The guys next door.  Um, I'm familiar with with the Defendant who lives two
        doors down.  And I asked him, do you mean Jeff Fry?

Q:      All right.

A:      And, his response was: Yeah.

                                        ***

Q:      Did he -- was he able to make an identification?

A:      I asked him if he could describe the - - the subject, in any way, and he said he
        didn't know names, be he could identify him if he saw him again.  And, from
        this -- the way he said it he was -- appeared to be pretty certain in his answer.

(Tr. II, 58-59; 60-61.)

        Detective Kenneth Alofs presented a photo lineup to the victim a day after the

shooting.  (Tr. III, 193.)  According to Petitioner, the photo lineup did not include photos of

Darlynzo Brown or Troy Elliott, the other two men arrested with Petitioner.  The victim looked at the photographs for less than a minute and positively identified Petitioner as the shooter.  (Tr. II, 183, 192; Tr. III, 197.)  Petitioner's counsel was not present for the photo lineup.  Petitioner contends that the identification procedure was highly suggestive because Officer Seifferly had suggested to the victim that "Jeff Fry" was the shooter.

Petitioner raised this claim for the first time in his motion for relief from judgment. As previously discussed, the claims set forth in his motion for relief from judgment are procedurally defaulted.  Because Petitioner's claim clearly is without merit, the Court will forego the cumbersome procedural default analysis and proceed to the merits of Petitioner's claim.  *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003) (federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits); *Cone*, 243 F.3d at 971 (deciding claim on the merits, assuming without deciding that the Petitioner did not procedurally default it or could show cause and prejudice); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999) (where the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that petitioner could show cause and prejudice for that default).

The Due Process Clause prohibits the use of an identification which is impermissibly suggestive under the totality of the circumstances and which presents an unacceptable risk of irreparable misidentification.  *Carter v. Bell*, 218 F.3d 581, 605 (6th Cir. 2000).  In reviewing a due-process claim involving an identification procedure, the Supreme Court has adopted a two-part test: (1) the defendant must show the identification procedure was impermissibly suggestive; and (2) if the procedure was suggestive, the court examines the totality of the circumstances to determine

- 48 -

whether the identification was nonetheless reliable. *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992) (synthesizing Supreme Court precedent). In examining the totality of the circumstances, this court considers several factors, including: "(1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty when identifying the suspect at the confrontation; and (5) the length of time that has elapsed between the crime and the confrontation." *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

In this case, Petitioner does not claim that the photographic lineup was itself suggestive. Rather, he contends that Seifferly's reference to Petitioner's name the previous day somehow tainted the photographic lineup. Petitioner does not allege that names appeared in the photo lineup or that Detective Alofs told the victim the names of the men included in the lineup before the victim made the identification. Thus, the fact that Seifferly mentioned Petitioner's name to the victim did not assist the victim in selecting Petitioner's photo from the lineup. Petitioner, therefore, cannot show that the identification procedure was impermissibly suggestive.

Even if the identification procedures were impermissibly suggestive, the identification was reliable under the totality of the circumstances. The victim testified at trial that Petitioner approached he and Damion Bates, while they were standing talking and asked Bates for a light. (Tr. II, 139.) Petitioner then addressed the victim before shooting him from a distance of six to nine feet. (Tr. II, 143.) Thus, Petitioner had the opportunity to view the shooter for a substantial period of time. Moreover, the victim testified that he had seen Petitioner at the house next door more than thirty times before the shooting, but did not know his name. (Tr. II, 148-49.) After the shooting, the victim remained alert and told police officers that he was shot by the "guy(s) next door." (Tr. II, 60,

83.)  The victim also told Officer Seifferly that he could identify the shooter if he saw him again. (Tr. II, 52, 64, 77.)  The victim picked Petitioner from the photographic lineup the day after the shooting with no hesitation.  At trial, Petitioner testified that he was absolutely certain that Petitioner was the person that shot him.  (Tr. II, 149.)  In light of the record, I cannot find that Petitioner's due process rights were violated by the photographic identification.

Furthermore, the Constitution does not require the presence of counsel at a photographic lineup.  The Sixth Amendment provides, in relevant part:  "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. CONST. amend VI.  The right to counsel exists at all so-called "critical stages" of the trial process, that is, "at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected."  *Mempa v. Ray*, 389 U.S. 128, 134 (1967).  As a general matter, once criminal proceedings have begun a corporeal line-up is such a "critical stage" of the proceedings to which the right of counsel attaches.   *See Gilbert v. California*, 388 U.S. 263, 272 (1967); *United States v. Wade*, 388 U.S. 218 (1967).  In *United States v. Ash*, 413 U.S. 300 (1973), however, the Court expressly distinguished between photographic and corporeal line-ups, and declined to extend the Sixth Amendment right of counsel to photographic line-ups, holding that "the Sixth Amendment does not grant the right to counsel at photographic displays conducted by the Government for the purpose of allowing a witness to attempt an identification of the offender."  *Id.* at 321; *see also, Moore v. Illinois*, 434 U.S. 220, 227 n.3 (1977).  Thus, Petitioner had no federal constitutional right to counsel at the photographic line-up.

Petitioner also claims that his trial counsel was ineffective for failing to move for suppression of the photographic lineup and the victim's identification testimony.  In *Strickland v.*

*Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  I concluded above that Petitioner's due process claim arising from the photographic lineup was without merit.  Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel.  *See Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994).  Consequently, Petitioner's claim of ineffective assistance of counsel must fail.

### D.     **Admission of Photographs: Ground VI**

In his Sixth Ground for habeas corpus relief, Petitioner claims that his rights to due process and a fair trial were violated by the admission of highly prejudicial photographs of the victim's injuries.  Petitioner contends that the photographs of the victim's head, back and stomach injuries after undergoing surgery were especially prejudicial when the nature and extent of the victim's injuries were not in dispute.  Petitioner raised this claim for the first time in his motion for relief from judgment, and, thus, it is procedurally defaulted.  Because Petitioner's claim lacks merit, I will assume that Petitioner can show cause and prejudice and proceed to the merits of his claim. *See Hudson*, 351 F.3d at 215-16 ; *Cone*, 243 F.3d at 971; *Binder*, 198 F.3d  at 178.

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle*, 502 U.S. 62, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman*, 268 F.3d at 439; *Bugh*, 329 F.3d at 512.

Petitioner was not denied a fundamentally fair trial by the admission of photographs of the victim's injuries.  According to the trial record, eight photographs of the victim's injuries were admitted at trial.  (Tr. II, 189-92.)  The photographs depicted his injuries at the time of trial because no photographs were taken of victim's injuries before he received medical treatment.  (Tr. II, 186-89.)  The photos at issue in the case were not unduly prejudicial.  Without a doubt, photographs of the victim's healed scars were far less gruesome than if photographs had been taken before he received medical treatment.  The photographs were relevant to illustrating trial testimony regarding the victim's injuries.  The Sixth Circuit has found no due process violation in far more extreme cases involving photographs of murder victims.  *See, e.g. Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) (holding that admission of photographs depicting murder victim's severed head, her severed head held near her torso and severed breast, and her torso with her severed head and severed breast

replaced on torso, did not deprive defendant of fair trial, and thus did not warrant federal habeas relief).  Accordingly, Petitioner's claim falls far short of a due process violation.

### E.   Ineffective Assistance of Counsel: Ground VIII

In Ground VIII, Petitioner claims that his Sixth Amendment right to the effective assistance of counsel was violated "for numerous reasons set forth below."  However, in the body of his argument, he claims only that his trial counsel was ineffective when he did not object during the  prosecutor's closing argument when she repeatedly called Petitioner and his witnesses "liars." Petitioner's claim is procedurally defaulted because it was raised for the first time in his motion for relief from judgment.  Petitioner cannot meet the requirement for a claim of ineffective assistance of counsel, so I will assume without deciding that Petitioner can show cause and prejudice and proceed to the merits of his claim.  *See Hudson*, 351 F.3d at 215-16 ; *Cone*, 243 F.3d at 971; *Binder*, 198 F.3d  at 178.

Under *Strickland*, 466 U.S. at 687-88, Petitioner must prove that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

In reviewing Ground VII, I concluded that the prosecutor did not engage in misconduct when she referred to Petitioner and his witnesses as "liars" because they each had

admitted to lying to police officers during their trial testimony. Because the prosecutor was free to comment upon the evidence admitted at trial, an objection by defense counsel likely would have been unsuccessful. Moreover, an objection would have drawn attention to the prosecutor's comments and given her the opportunity to further elaborate on the admitted lies of Petitioner and his defense witnesses. The Supreme Court noted in *Strickland*, 466 U.S. at 689:

> Judicial scrutiny of counsel's performance must be highly deferential . . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." (citation omitted).

*See also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). I conclude that, under the standard of deference established in *Strickland*, trial counsel's conduct falls within the range of reasonable professional assistance. Where counsel's performance did not fall below an objective standard of reasonableness, the court need not reach the question of prejudice. *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) ("When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'") (quoting *Strickland*, 466 U.S. at 697).

F.    **Trial Court's Failure to Address Petitioner's Motion for Relief from Judgment: Ground IX**

Petitioner claims in Ground IX, that by rejecting his motion for relief from judgment pursuant to MICH.CT.R. 6.508(D)(3), the trial court violated his constitutional rights and the intent of the legislature to grant new trials when good cause is shown. Under MICH.CT.R. 6.508(D)(3), the court may not grant a motion for relief from judgment if the motion alleges grounds for relief that could have been raised on direct appeal unless the defendant demonstrates cause and prejudice.

- 54 -

While Petitioner asserts a violation of his "constitutional" rights, his argument is grounded exclusively in Michigan law. A petition states a claim for federal habeas relief only if it alleges that the petitioner is in custody in violation of the United States Constitution or laws. *Mabry v. Johnson*, 467 U.S. 504, 507 (1984). The federal courts have no power to intervene on the basis of a perceived error of state law. *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987) ("The federal habeas court does not act as an additional state appellate court to review a state court's interpretation of its own law or procedure."). Consequently, Petitioner's claim is without merit.

### G.    Sentence Proportionality: Ground X

In his tenth ground for habeas corpus relief, Petitioner claims that his sentence of twenty to thirty years for the assault with intent to murder conviction was disproportionate. Petitioner's claim is procedurally defaulted because it was raised for the first time in his motion for relief from judgment. Because Petitioner's claim is without merit, I will forgo the procedural default analysis and proceed to the merits of his claim. *See Hudson*, 351 F.3d at 215-16; *Cone*, 243 F.3d at 971; *Binder*, 198 F.3d at 178.

Petitioner contends that his sentence was disproportionate under the analysis enunciated by the Michigan Supreme Court in *People v. Milbourn*, 461 N.W.2d. 1 (Mich. 1990). Under *Milbourn*, the sentencing court must exercise its discretion within the bounds of Michigan's legislatively prescribed sentence range and pursuant to the intent of Michigan's legislative scheme of dispensing punishment according to the nature of the offense and the background of the offender. *Milbourn*, 461 N.W.2d at 9-10. It is plain that *Milbourn* was decided under state, not federal, principles. *See Lunsford v. Hofbauer*, No. 94-2128, 1995 WL 236677, at * 2 (6th Cir. Apr. 21,

1995); *Atkins v. Overton*, 843 F. Supp. 258, 260 (E.D. Mich. 1994).  In addressing a claim that a sentence violated *Milbourn* proportionality, the Sixth Circuit stated that the issue was a matter of state law and that there was "no violation of a constitutional right because the United States Constitution contains no strict proportionality guarantee." *Lunsford*, 1995 WL 236677, at *2 (citing *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991) and *United States v. Hopper*, 941 F.2d 419, 422 (6th Cir. 1991)); *Terry v. Trippett*, No. 94-2077, 1995 WL 469424, at *1 (6th Cir. Aug. 7, 1995) (same).  Thus, Petitioner's proportionality claim is solely an issue of state law that is not cognizable in a habeas corpus action.

Petitioner's claim also fails to implicate his Eighth Amendment right against cruel and unusual punishment.  The United States Constitution does not require strict proportionality between a crime and its punishment.  *Harmelin*, 501 U.S. at 965; *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). "Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment." *Marks*, 209 F.3d at 583.  A sentence that falls within the maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'" *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)).  Furthermore, "[f]ederal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole." *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995).  Petitioner was not sentenced to death or life in prison without the possibility of parole. Therefore, Petitioner's sentence does not run afoul of the Eighth Amendment's ban of cruel and unusual punishment.

H.    **Cumulative Effect of Ineffective Assistance of Counsel and Prosecutorial Misconduct: Ground XI**

Petitioner claims in Ground XI that his due process rights were violated by the cumulative effect of the errors committed by trial counsel and the prosecutor.  This claim also is procedurally defaulted because it was raised for the first time in his motion for relief from judgment. Petitioner's claim clearly is without merit; therefore, I will forego the procedural default analysis and proceed to the merits of the claim.  *See Hudson*, 351 F.3d at 215-16; *Cone*, 243 F.3d at 971; *Binder*, 198 F.3d at 178.

Under the AEDPA, a court only may grant habeas relief based on a misapplication of Supreme Court law.  *Bailey*, 271 F.3d at 655.  The Sixth Circuit repeatedly has stated that cumulative error claims are not cognizable on habeas review.  "The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief."  *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *Baze*, 371 F.3d at 330; *Millender v. Adams,* 376 F.3d 520, 529 (6th Cir. 2004); *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002).  Finally, because I concluded above that the individual claims are without merit, Petitioner cannot show that the cumulative error violated his constitutional rights.  *See Seymour*, 224 F.3d at 557.

I.        **Juror Impartiality and Misconduct: Ground XII**

In Ground XII, Petitioner claims that trial court erred when it denied his motion for an evidentiary hearing and a new trial based upon newly discovered evidence of juror impartiality and misconduct.  Petitioner filed a motion for an evidentiary hearing in the Kalamazoo County Circuit Court on the basis of newly discovered evidence that jurors engaged in misconduct, were biased, gave false answers during voir dire and were subjected to outside influence during his trial.

His claim relies upon a letter sent by Juror Kimberly Veen wrote to the court dated May 5, 2003,

almost five years after Petitioner's trial.  The letter stated in part:

> I was one of two jurors that did not vote Fry guilty immediately and the last to vote guilty in the end.
>
> ***
>
> There were four things that encouraged me to vote Fry guilty in the end.  One was that there were two jurors, as I remember it, who were both held at gunpoint at some point in their adult lives.  They believed from their experience that anyone who had a gun pointed to their face and who had a good look at the shooter would remember that face long into the future.  Therefore, it was highly unlikely that Venson was mistaken . . . Thirdly, the other person that hesitated in voting Fry guilty was a Black women from the north side.  Her biggest reason not to vote guilty on all counts seemed to be that she was worried about revenge and her safety in her neighborhood.  When she decided to put her safety at risk and voted guilty too, I became more comfortable doing the same.  The final reason was simple peer pressure.  Everyone else seemed so sure and comfortable with their decision and the trial had gone longer than anticipated.  For lack of a better word, I gave in . . .

(Kimberly Veen Letter, 1-2, docket #30.)  In an opinion and order issued on December 4, 2003, the

circuit court denied Petitioner's motion, stating in part:

> Defendant has not shown that the jury was exposed to outside or extraneous influences, nor that any extraneous influence created a real and substantial possibility that it could have affected the jury's verdict.  Defendant simply argues that one or more jurors did or may have given false or erroneous answers during voir dire.  Defendant does not identify any false or erroneous answers during voir dire or who provided them.  Defendant claims jurors concealed, misrepresented, or falsely testified about facts of their lives; presumably whether they were crime victims (although he never expressly makes this claim).  He provides no support for his claims, which are not supported by the record or Juror Veen's letter.  The record discloses half of the jurors acknowledged being crime victims or involved with crime victims.

(Kalamazoo County Circuit Court Op. & Ord., Dec. 4, 2003, docket #30.)  Both the Michigan Court

of Appeals and the Michigan Supreme Court denied Petitioner's application for leave to appeal

pursuant to MICH.CT.R. 6.508(D); therefore, Petitioner's claim is procedurally defaulted.  Petitioner

contends that his claim should not be considered defaulted because it is based upon newly discovered evidence. Because Petitioner's claim is without merit, I will forego the procedural default analysis and proceed to the merits of his claim. *See Hudson*, 351 F.3d at 215-16 ; *Cone*, 243 F.3d at 971; *Binder*, 198 F.3d at 178.

The Sixth Amendment, which is applicable to the state through the Fourteenth Amendment provides that a criminal defendant is entitled to a fair trial by a panel of impartial jurors. *See Irvin v. Dowd*, 366 U.S. 717 (1960). Notwithstanding a defendant's right to an impartial jury, it is a well established rule of common law that a jury verdict may not be impeached by the testimony of one or more jurors. *See Tanner v. United States*, 483 U.S. 107, 117 (1987); *Mattox v. United States*, 146 U.S. 140, 149 (1892). The rule is supported by the important policy consideration of protecting jury deliberations from public scrutiny. *Tanner*, 483 U.S. at 119-20. Exceptions to the common law rule have been recognized in narrow circumstances where the jury has been exposed to an extraneous or "external" influence. *Id.*

Examples of Supreme Court cases applying the common law exception for extraneous influences include *Mattox*, in which the Supreme Court held admissible the testimony of jurors that during deliberations one of the bailiffs in charge of the jury told them that the defendant had murdered other victims before, and testimony that the jurors had read a newspaper article during deliberations characterizing the evidence against the defendant as exceptionally strong. *See Mattox*, 146 U.S. at 142-43, 149. The *Mattox* Court stated that "a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind." *Id.* at 149. Similarly, in *Parker v. Gladden*, 385 U.S. 363 (1966) (per curiam), the Supreme Court considered testimony that some of the jurors overheard a bailiff's

- 59 -

comments that the defendant was a wicked, guilty man and that if there was anything wrong with convicting the defendant, the Supreme Court would correct it.  The Court noted that the statements made by the bailiff were not subjected to confrontation or cross-examination, which "are among the fundamental requirements of a constitutionally fair trial."  *Id.* at 364-65.

The *Tanner* Court further explained that in situations not falling within the exception for external influences, the Supreme Court has "adhered to the common-law rule against admitting juror testimony to impeach a verdict."  *Tanner*, 483 U.S. at 117.  For example, in *Hyde v. United States*, 225 U.S. 347, 384 (1912), the Supreme Court decided that the applicable legal rule prevented the consideration of juror testimony that a bargain had been struck between the jurors during deliberations to convict one defendant in exchange for acquitting another.  Similarly, in *McDonald v. Pless*, 238 U.S. 264, 267 (1915), the Court concluded that juror testimony that the jury had rendered a quotient verdict was inadmissible for the purpose of impeaching that verdict.  The *McDonald* Court recognized that two competing interests were at stake - the defendant's interest in a fair trial and the public's interest in maintaining a working jury trial system.  *McDonald*, 238 U.S. at 267.  The Court concluded that, in the case of juror testimony about internal jury deliberations, the interest in protecting the jury system was overriding:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding.  Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict.   If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

*Id.*  The *Tanner* Court reaffirmed the legal principle from *McDonald* in defense of the exclusion of the juror testimony:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior.  It is not at all clear, however, that the jury system could survive such efforts to perfect it.  Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process.  Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of lay people would all be undermined by a barrage of postverdict scrutiny of juror conduct.

483 U.S. at 120 (internal citation omitted). The Court concluded that the exclusion of the juror testimony did not violate the defendant's right to a fair and impartial trial in light of the "long-recognized and very substantial concerns support[ing] the protection of jury deliberations from intrusive inquiry." *Id.* at 127.  Moreover, the Court reasoned that defendants' rights are sufficiently protected by a number of other safeguards in the trial process, including examination of the jurors during voir dire, the ability of jurors to report misconduct prior to rendering a verdict, and the evidence other than juror testimony.  *Id.* at 127.

In this case, Petitioner has failed to allege any extraneous influence on the jury whatsoever.  Internal factors, including whether a juror was pressured into arriving at a particular conclusion, may not be used to challenge a final verdict.  *Doan v. Brigano*, 237 F.3d 722, 733 (6th Cir. 2001) (citing *Tanner*, 483 U.S. at 117-21), *abrogated on other grounds by Wiggins*, 539 U.S. 510.  In *Mattox* and its progeny, the Supreme Court intended to protect the finality of the jury verdict in cases such as this where a juror comes forward nearly five years after the trial and casts doubt on the jury's deliberations.  Therefore, under clearly established Supreme Court precedent, the jury's verdict in Petitioner's case cannot be impeached by Veen's testimony.  While Petitioner implies that

jurors lied during voir dire concerning whether they had been victims of crime, he does not make any specific allegations or point to any specific instance of a false response in the trial record. Furthermore, nothing in Juror Veen's letter demonstrates bias on the part of any juror. The alleged comments of two jurors that "anyone who had a gun pointed to their face and who had a good look at the shooter would remember that face long into the future," does not show bias against Petitioner. Rather, the jurors comments concern the credibility of the victim's identification of Petitioner as the shooter. Thus, Petitioner is not entitled to habeas relief on this claim.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date: August 5, 2008                          /s/ Ellen S. Carmody
                                              ELLEN S. CARMODY
                                              United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).